**UNITED STATES BANKRUPTCY COURT**          Chapter 11
**SOUTHERN DISTRICT OF NEW YORK**

In re:

COSMOLEDO, LLC, *et al.*[1]

                              Debtors.

Case No. 20-12117 (   )

(Joint Administration Pending)

## DECLARATION OF JOSÉ ALCALAY PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, José Alcalay, hereby declare under penalty of perjury:

### Qualifications

1.      I am the Chief Executive Officer of Cosmoledo, LLC ("Cosmoledo" and, together with its affiliated debtor subsidiaries, the "Debtors" or the "Company"), a restaurant operator in New York City.

2.      I have served as the Company's Chief Executive Officer since March 2020. I have also served as President of the Company from May 2019 to March 2020, Chief Financial Officer & Chief Operating Officer from March 2018 to May 2019 and Chief Financial Officer from September 2016 to March 2018. Prior to serving the Company, I held various senior financial and executive positions in different industries since 2002. I am an American citizen and hold the equivalent of a master's degree in International Business Development from the University of

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Cosmoledo, LLC (6787); Breadroll, LLC, (3279); 688 Bronx Commissary, LLC (6515); 95 Broad Commissary, LLC (2335); 178 Bruckner Commissary, LLC (2581); 8 West Bakery, LLC (6421); NYC 1294 Third Ave Bakery, LLC (2001); 921 Broadway Bakery, LLC (2352); 1800 Broadway Bakery, LLC (8939); 1535 Third Avenue Bakery, LLC (1011); 2161 Broadway Bakery, LLC (2767); 210 Joralemon Bakery, LLC (4779); 1377 Sixth Avenue Bakery, LLC (9717); 400 Fifth Avenue Bakery, LLC (6378); 1400 Broadway Bakery, LLC (8529); 575 Lexington Avenue Bakery, LLC (9884); 685 Third Avenue Bakery, LLC (9613); 370 Lexington Avenue Bakery, LLC (0672); 787 Seventh Avenue Bakery, LLC (6846); 339 Seventh Avenue Bakery, LLC (1406); and 55 Hudson Yards Bakery, LLC (7583).

Paris XIII and the equivalent of an Associate BA in Electrical Engineering from the University of
Technology of Cachan (France).

3.      As Chief Executive Officer, I am responsible for overseeing the Company's day to
day operations and financial activities, including, but not limited to operational planning, employee
matters, business relationships, and financial planning.

4.      I submit this declaration (this "Declaration") pursuant to Rule 1007-2 of the Local
Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") to assist
the Court and parties in interest in understanding the facts and circumstances requiring the
commencement of these chapter 11 cases and in support of the Debtors' (a) voluntary petitions for
relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b)
various motions and applications, filed concurrently herewith, including various "first day"
motions (collectively, the "First Day Pleadings").

5.      Except as otherwise noted, I have personal knowledge of the matters set forth in
this Declaration, or have gained knowledge of such matters from my discussions with the Debtors'
employees, retained advisors, and/or my review of relevant documents and information concerning
the Debtors' operations and financial affairs in the ordinary course of my responsibilities as an
officer of the Debtors. All references to the Bankruptcy Code, the chapter 11 process, and related
legal matters are based on my understanding in reliance on the explanations provided by, and the
advice of, counsel.

6.      I am over the age of 18 and authorized to submit this Declaration on behalf of the
Debtors. If called upon to testify, I could and would testify competently as to the facts set forth
herein.

7.     This Declaration is divided into four parts. Part I of this Declaration provides an overview of the Debtors' business and operations, including their corporation and capital structure. Part II describes the circumstances leading to the commencement of these chapter 11 cases and the Debtors' restructuring plans. Part III sets forth the relevant facts in support of each of the Debtors' First Day Pleadings. Part IV provides the specific information required by Local Bankruptcy Rule 1007-2.

## PART I: THE DEBTORS' BUSINESSES AND OPERATIONS

**A.     The Chapter 11 Filings**

8.     On September 10, 2020 (the "Petition Date"), each of the above-captioned Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 with the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors will continue limited operations and manage their businesses as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases by motion filed concurrently herewith.

**B.     Overview of the Company's Businesses and Operation**s

9.     Maison Kayser, a global brand, is an authentic, artisanal French boulangerie initially formed in Paris in 1996. Maison Kayser has approximately 150 shops in over 22 different countries.

10.     Cosmoledo, a Delaware limited liability company, was formed on December 21, 2010, and the Company opened its first Store located at 1294 Third Avenue in New York City in 2012. The Company has been continually in business since that time. Until recently the Company operated sixteen (16) locations (each a "Store," and collectively, the "Stores") in New York City.

3

A complete list of the Stores and the locations is annexed hereto as Exhibit A. The company also leases a commissary for consolidated production and owns a piece of fee owned real property located at 668 East 135th Street, Bronx, New York.

11.     Each of the Stores is a "fine casual" dining concept that follows one of the following business models or combines models tailored to the anticipated market. Three of these four business models derive a percentage of their revenue from in-Store dining.

- Full Expression (bakery, restaurant & grab and go)
- Residential (bakery & restaurant)
- Bakery & Grab and Go
- Bakery, Grab and Go, & Made-to-Order (no in-Store dining)

12.     The Debtors' production and operational costs are historically high because of the nature of their business concept. The company's trade name derives from its namesake and licensor, Eric Kayser. Mr. Kayser has long been recognized as one of the most talented artisan bakers of his generation and has built his reputation on his passion for bread, the quality of his products and his incredible skill to combine authenticity and innovation in the world of French artisanal bakeries. Maintaining these high standards demands the highest quality ingredients, meticulous processes and state of the art equipment.

## C.    Corporate Organization

13.     A corporate organization chart is attached hereto as Exhibit B. The Company's Stores, the commissary, and the fee owned real property are each owned by a separate, sole member, New York limited liability company. The sole member of each such LLC is Cosmoledo.

14.     Cosmoledo is also the sole member of Breadroll, LLC ("Breadroll"), which acts as the Company's main payroll affiliate. When the Company was forced to suspend operations, and

furloughed much of its work force, most of those whom were furloughed were direct employees of Breadroll. Only management level employees are employed by Cosmoledo.

15.      All of the equity of Cosmoledo is held by Moussechoux, Inc. As of the Petition Date, Moussechoux, Inc. owns all of the outstanding preferred membership units and common units of Cosmoledo.

**D.      Capital Structure**

**1.  Debt**

16.      Cosmoledo, one of the Debtors, holds all the equity of each other Debtor. Between January 29, 2016 and February 26, 2018, Cosmoledo entered into a series of notes, payable to Moussechoux, Inc. (the "Original Secured Creditor"), to fund, among other things, the Debtors' operations and growth (each a "Prior Note," and collectively, the "Prior Notes"). The aggregate principal amount of the Prior Notes was fifty-nine million dollars ($59,000,000.00).

17.      On March 6, 2019, Cosmoledo entered into a Debt Purchase Agreement (the "Debt Purchase Agreement"), pursuant to which Cosmoledo exchanged the Prior Notes for eight (8) amended and restated promissory notes (each an "Amended Note," and collectively, the "Amended Notes"). Each Amended Note was issued in the same amount as the amounts then due (including accrued and unpaid interest) under its corresponding Prior Note.  Pursuant to the Note Purchase Agreement, the Debtor also issued a new note to the Original Secured Creditor (the "New Note," and together with the Amended Notes, the "Notes"), in the same form as the Amended Notes, for ten million dollars ($10,000,000.00), which amount was received by Cosmoledo and its subsidiaries.

18.      Pursuant to each of the Notes, the Cosmoledo was obligated to pay the unpaid principal amount due thereunder and all interest due thereon on January 28, 2020 (the "Maturity

Date"). Cosmoledo and the Original Secured Creditor entered into a Limited Waiver of rights on January 28, 2020 under which the Original Secured Creditor agreed to temporarily waive, until February 28, 2020, Cosmoledo's compliance with the obligation to pay all principal and interest due under the Notes on the Maturity Date. On February 25, 2020, the parties entered into Limited Waiver No. 2, extending the Maturity Date through July 30, 2020. On July 29, 2020, the parties entered into a Forbearance Agreement pursuant to which the Original Secured Creditor agreed to forbear from exercising remedies under the Notes through August 14, 2020. On August 14, 2020, the parties entered into an Amended and Restated Forbearance Agreement pursuant to which the Original Secured Creditor agreed to forbear from exercising remedies under the Notes through September 30, 2020.

19.     On September 10, 2020, the Original Secured Creditor sold and assigned all of its rights, title, interests and obligations to and under the Notes and all other documents relating thereto (including but not limited to all collateral documents executed by any of the Debtors in connection with the Notes, the Debt Purchase Agreement and the Collateral (as hereafter defined)) to MK Debt, LLC, a Delaware limited liability company (the "Secured Creditor"), an affiliate of MK USA, LLC, a Delaware limited liability company (the "Purchaser"), and which is the stalking horse bidder, in the sale contemplated by the 363 Motion.

20.     Since the Debtors original plan was to reopen (first in June, then in September) Breadroll LLC, ("Breadroll") applied for a loan under the Paycheck Protection Program ("PPP") offered by the Small Business Administration under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), section 7(a)(36) of the Small Business Act (the "PPP Loan"). The PPP Loan was funded on April 20, 2020 in the amount of $6,662,292. Approximately four million four hundred fifty thousand dollars ($4,450,000) of the original loan amount remains in Breadroll's

bank account on the Petition Date and is not subject to the lien of the Secured Creditor. Prior to

the Petition Date, the Debtors transferred approximately two million two hundred fifty thousand

dollars ($2,250,000) from Breadroll's bank account which was holding only the proceeds from the

PPP Loan to an account owned by Cosmoledo and subject to the security interest of the Secured

Creditor. In the aggregate, the Debtors' bank accounts contain sufficient funds to repay the PPP

Loan.

21.    In connection with the sale contemplated under the 363 Motion, the Purchaser may

take an assignment of the PPP Loan. However, the necessary consents from the Small Business

Administration (the "SBA") and Santander Bank were not obtained as of the Petition Date. In the

event such consents are not obtained on or before the closing of a sale, the Debtors propose to

transfer sufficient cash out of the Debtors' other accounts to cover all amount owed under the PPP

Loan and place such amounts in a separate escrow account to be held by proposed counsel to the

Debtors. These funds will be held and only released to the Purchaser in accordance with the Asset

Purchase Agreement between the Debtors and the Purchaser (the "Sale Agreement") as set forth

in the 363 Motion. In the event an assignment of the PPP Loan is denied or does not take place by

November 30, 2020, the Debtors intend to move this Court for authority to repay the PPP Loan.

22.    Pursuant to the terms of the Notes, Cosmoledo's outstanding obligations are

secured by first-priority security interests in all of their accounts, chattel paper, commercial tort

claims, deposit accounts, documents, general intangibles, goods (and accessions thereto),

instruments, investment property, letter-of-credit rights, supporting obligations, and all products

and proceeds thereof (the "Collateral"). The Original Secured Creditor perfected its lien on the

Cash Collateral (as hereinafter defined) by a UCC-1 filing financing statement filed with the

Delaware Secretary of State on March 29, 2019 and entering into a Limited Access Services

7

Agreement, dated as of December 27, 2019 with Cosmoledo and Santander Bank, N.A. Accordingly, it is the Debtors' position that a substantial portion of the Debtors' cash, whether now existing or hereafter acquired, constitutes "cash collateral" of the Secured Creditor, within the meaning of Bankruptcy Code sections 363(a) and 552(b) ("Cash Collateral").

23.    As of September 8, 2020, of the Petition Date the Secured Creditor had an outstanding amount of seventy-two million seven-hundred and forty-two thousand and four hundred eighteen dollars ($72,742,418.00), plus fees and expenses provided for in the Notes (the "Claim"). The value of the Cash Collateral as of the Petition Date was approximately $3,665,990.18 and the value of the Collateral as of the Petition Date was in excess of $5,400,000.

24.    The Debtors and the Secured Creditor have executed a stipulation (the "Stipulation") in which the Secured Creditor consents to the use of Cash Collateral and the Debtor agrees to provide the Secured Creditor with certain adequate protection in exchange for such consent. The negotiations over the Stipulation were conducted in good faith and at arms' length.

25.    On or about April 9, 2015, 688 Bronx Commissary, LLC, received a loan from Interaudi Bank in the amount one million two hundred thirty-five thousand dollars ($1,235,000) encumbering the premises located at 688 East 135th Street, New York, NY 10454 (the "Interaudi Bank Loan"). Cosmoledo is the guarantor of the Interaudi Bank Loan. The Interaudi Bank Loan is to be paid over twenty-five (25) years with a balloon payment due at the end. As of the Petition Date, one million sixty-eight four hundred forty-seven dollars ($1,068,447.84) remains due. As of the Petition Date, Debtors remain current on all payments due under the Interaudi Bank Loan.

**PART II: EVENTS LEADING TO THESE CHAPTER 11 CASES
AND CHAPTER 11 GOALS**

**A.  Events Leading to filing these Chapter 11 Cases**

26.     The restaurant industry is facing well documented challenges caused by the global COVID-19 pandemic. New York City restaurants have felt this acute pain since mid-March when Governor Cuomo declared a state of emergency for the State of New York which required the Debtors to cease operations.[2]  Restaurants are not yet open for in-house dining and many are limited to delivery and take-out options while needing to cover their full overhead. Many longstanding pillars of the industry have closed for good.

27.     The Company's original business model contemplated expansion to a national footprint in a relatively short period of time. At its height, the Company was making products from scratch in its bakery enabled Stores and two (2) separate 20,000-square-foot and 30,000-square-foot commissaries – one (1) in the Bronx and one (1) in New Jersey. The Company had also expanded out of New York City and opened Stores in Washington, D.C. In or around early 2019, it became clear that the operational overhead and performance of the "out of town" Stores were too great a drag on the Company's overall profitability. The Company retained professionals and formulated a restructuring strategy that included a recapitalization of Company, the reorganization of their production facilities, a reduction of their footprint and a revision to the structure of Store level management.

28.     That strategy was implemented throughout 2019 and mostly completed in the first quarter of 2020. At approximately the same time this restructuring was nearing completion, the Debtors' business was devastated by the global COVID-19 pandemic. The Company furloughed approximately 800 employees and shuttered its operations. At the time, it was anticipated that in-Store dining would resume, and the Company could reopen in June. On or about June 18, 2020, it became clear that the phased reopening of New York City, which included restaurants, would not

_____

[2]      *See* New York State Executive Order No. 202, dated March 7, 2020.

allow sufficient operations to support the Debtors' recovering financial situation. As of the Petition

Date, there is still little prospect of in-Store dining any time soon. After analyzing the financial

impact stemming from the macro economic factors impacting the restaurant industry, of the loss

of in-Store dining revenue and the continued overhead required to sustain even limited operations

(take-out and delivery), the Company determined that there was too great a risk that future

operations would fail to generate sufficient capital to repay its obligations in the ordinary course

of its business and continue profitable operations. Accordingly, the Debtors decided to not reopen

the Stores and began seeking restructuring alternatives in mid-July.

**B. The Debtors' Prepetition Marketing Efforts and Identification of a Stalking Horse**

29.     Prior to the Petition Date, the Debtors worked diligently to identify an acquirer for

its assets and business for almost sixty (60) days. To that end, the Debtors prepared financial and

operational materials for dissemination to potential acquirers of all the Debtors' assets and

contacted over 20 likely candidates.

30.     Fourteen (14) parties evidenced an interest in conducting due diligence, and the

Debtors provided each of them  with a non-disclosure agreement so they could review the financial

and operational materials it had prepared as well as such additional information as the parties

requested. In addition, José Alcalay, the Debtors' Chief Executive Officer, made himself available

to answer questions, address concerns and discuss how a sale might be structured.

31.     Following diligence review, the company received four (4) indications of interest.

After additional diligence and discussions with the Debtors' professionals, four (4) letters of intent

were received. After review and consideration of all offers, the Debtors' board of directors (the

"Board") determined to move forward to document a proposed transaction with MK USA, LLC,

a Delaware limited liability company (the "Purchaser").

32.    The offer received from the Purchaser is the result of extensive, arms' length negotiations, and I believe that such offer is fair and reasonable and in the best interests of the Company and the estates. The offer has been memorialized in an Asset Purchase Agreement dated September 10, 2020 (the "Sale Agreement"). Pursuant to the Sale Agreement, the Purchaser intends to purchase all or substantially all of the assets of the Company, as defined in the Sale Agreement, including (a) the right to have the Debtors' leases and executory contracts assumed and assigned to it or a designee, (b) all of the Debtors' inventory and equipment and (c) the Debtors' inventory in exchange for three million dollars ($3,000,000) in cash plus the value of the Credit Bid (as defined in the Sale Agreement) plus the assumption of the Assumed Liabilities. As the Sale Agreement makes clear, the Debtors intend to submit the offer to the rigors of the marketplace because the sale of the Debtors' assets is subject to higher and better offers, subject to certain proposed Bidding Procedures and an Auction as more fully set forth in the Debtors' Motion seeking approval of bid procedures and a sale to the Purchaser filed contemporaneously herewith (then "363 Motion"). The Sale Agreement also makes clear that the Purchaser is entitled to credit bid the Debtors' secured debt.

33.    In connection with the sale contemplated under the 363 Motion, the Purchaser may take an assignment of the PPP Loan. However, the necessary consents from the SBA and Santander were not obtained as of the Petition Date. In the event an assignment of the PPP Loan does not take place by a closing of the proposed sale, the Debtors intend to transfer sufficient cash out of the Cosmoledo and Breadroll operating accounts to cover all amounts owed under the PPP Loan and place such amounts in a separate escrow account to be held by Debtors' proposed counsel. If an assignment to the Purchaser gets denied or does not occur within the timeframe contemplated

under the Sale Agreement, the Board has instructed the Debtors to move this Court for authority to repay the PPP Loan.

### C.  Goals of the Chapter 11 Process

34.     These chapter 11 cases are intended to provide the Debtors with the breathing spell afforded by the automatic stay under Section 362 of the Bankruptcy Code, to protect and preserve their estates for the benefit of all stakeholders. As discussed above, the Debtors filed a motion seeking the Court's approval of the Purchaser as a "stalking horse" bidder in a sale process designed to maximize the value of the estate. To the extent there are assets that are not part of the sale to the Purchaser, the Debtor will take immediate action to reject or abandon them so as to minimize any administrative costs associated therewith. These cases will also provide a centralized forum where creditors may be heard, and the Debtors will be able to resolve claims on an equitable basis. The Debtors' hope is that a distribution to holders of allowed unsecured claims will ultimately be possible.

35.     As of the Petition Date, the Debtors believe they have sufficient funds on hand to administer these cases, run the sale process, consummate a sale and file a confirmable plan based on the Debtors' current forecasts. As set forth below, the Debtors have filed a motion seeking the approval to use cash collateral on a consensual basis to ensure this remains the case.

### PART III: FIRST DAY PLEADINGS AND ORDERS

36.     Concurrently with the commencement of these chapter 11 cases, the Debtors have filed the following pleadings (the "First Day Pleadings") and will seek orders approving the relief sought in those pleading and certain associated proposed orders (collectively, the "First Day Orders") at "first day hearings" authorized by the Court. I respectfully request that the Court

consider entering the proposed orders granting such First Day Pleadings. I have reviewed each of the First Day Pleadings and First Day Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings and First Day Orders is essential to the Debtors' ability to protect and preserve the value of their estates.

**A.    Administrative Pleadings**

37.    The Debtors are filing, contemporaneously herewith, several "administrative" motions pursuant to which they seek (a) joint administration of the Debtors' bankruptcy cases, authorization to file a single, consolidated list of the Debtors' twenty (20) largest unsecured creditors, extensions of the Debtors' deadline to file schedules and statements and related relief, and authorization to retain Donlin Recano & Company, Inc. ("DRC") as the Debtors' claims and noticing agent.

**i.    Joint Administration**

38.    The Debtors are requesting that their chapter 11 cases be jointly administered. The Debtors consist of twenty-one (21) entities, all of which, excluding Cosmoledo itself, are direct subsidiaries of Cosmoledo. The Debtors are centrally managed with all corporate functions consolidated into their parent company, Cosmoledo, with certain administrative functions (such as employee payroll) being performed by Breadroll. Accordingly, many of the motions, hearings and orders that will arise in the chapter 11 cases will jointly affect all the Debtors. By jointly administering the chapter 11 cases, I believe the Debtors will be able to reduce fees and costs resulting from the administration of these cases and ease the onerous administrative burden of having to file multiple and duplicative documents.

39.     The Debtors will continue to operate as separate and distinct legal entities., consistent with their prepetition practices. I believe that entry of an order directing the joint administration of the chapter 11 cases will avoid duplicative notices, applications, and orders, thereby saving the Debtors considerable time and expense. It is my understanding that  the relief sought in the Joint Administration Motion will also relieve the Court of the burden of entering duplicative orders and maintaining duplicative files and, supervision of the administrative aspects of the chapter 11 cases by the Office of the United States Trustee for the Southern District of New York will be simplified.

### ii.      Application to Retain DRC as Claims and Noticing Agent

40.     The Debtors seek authority to retain appointing DRC as their claims and noticing agent (the "Claims and Noticing Agent"). I believe that such relief is prudent considering the numerous creditors and parties-in-interest to whom certain notices will be sent and from whom proofs of claim may be received. Accordingly, and after consultation with proposed counsel to the Company, I believe that the most effective and cost-efficient manner by which to give notice in these cases is to engage DRC, an independent third party with significant experience in this role, to act as an agent of the Court.

### iii.     Authorization to File a Consolidated List of Creditors

41.     The Debtors are requesting authorization to file a single consolidated list of their top 20 creditors (the "Consolidated Top 20 List") in lieu of a Top 20 List (defined below) for each Debtor. I am advised that Rule 1007(d) of the Federal Rules of Bankruptcy Procedure requires a debtor to file a list containing information of its twenty largest unsecured creditors, excluding insiders (a "Top 20 List"). I am further advised that the Top 20 List is intended to facilitate the appointment of a creditors' committee by the United States Trustee (the "U.S. Trustee"). If a

14

creditors' committee is appointed, I believe the Consolidated Top 20 List will be sufficient to aid in the U.S. Trustee's appointment of a creditors' committee.

42.     I am advised that the Debtors have filed, or will soon file, a motion to retain CBIZ Accounting, Tax and Advisory of New York, LLC as Financial Advisor to the Debtors (the "Financial Advisor"). I am further advised that the Debtors' Financial Advisor has prepared, with the Debtors' assistance, a consolidated list of creditors and parties in interest based on the names and addresses the Debtors maintained in their databases or were otherwise readily ascertainable by the Debtors prior to the Petition Date (the "Creditor List"). Under the circumstances, I believe re-formatting the Creditor List, preparing and filing separate formatted creditor matrices, and otherwise complying with the filing requirements set forth by the office of the U.S. Trustee will impose unnecessary administrative burdens on, and will distract the Debtors without any corresponding benefit to the estates. In this context, I believe requiring each Debtor to file a Top 20 List would impose an unnecessary administrative burden on the Debtors, without conferring any benefit upon the Debtors' estates, Debtors' creditors, or the U.S. Trustee.

43.     The Debtors also have requested authority for their Claims and Noticing Agent to serve by regular mail the notice to creditors and shareholders parties of the commencement of these chapter 11 cases and of the meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "Notice of Commencement") to creditors and shareholders. In addition to mailing the Notice of Commencement, the Debtors propose to (i) publish, as soon as reasonably practicable, the Notice of Commencement on the website maintained by the Noticing Agent, and (ii) send the Notice of Commencement via email, as soon as reasonably practicable (where available) to creditors and shareholders. I believe these proposed procedures will ensure that the Debtors'

creditors all parties in interest receive prompt notice of the commencement of these chapter 11 cases and of the meeting of creditors.

44.     The Debtors have also requested to redact any individual personal information from any documents filed with the Court. I am advised that this would allow us to remove information such as the home addresses of individuals—including the Debtors' employees and former employees from public filings. I believe that such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking. As a good steward of my employees, I cannot permit that risk.

### iv.    Schedules and Statements Motion

45.     The Debtors are requesting that the Court extend the time by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs ("Schedules and Statements") to thirty (30) days after the current deadline. The requested extension would give the Debtors until up to forty-four (44) days after the Petition Date to file their Schedules and Statements. I believe no creditor or other party in interest will be prejudiced by the requested extension of time for the filing of the Schedules and Statements. Due to the circumstances leading to the filing of these chapter 11 cases, coupled with the number of the Debtors' creditors, the scope of the Debtors' operations, the size and complexity of the Debtors' business, and the limited staffing available to gather, process, and complete the Schedules and Statements, I believe the Debtors will be unable to complete their Schedules and Statements by the current deadline imposed by the Bankruptcy Code, as relayed to me by counsel. Given the substantial burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention the Debtors must devote to the restructuring process, I

believe that "cause" exists to extend the current deadline by thirty (30) days. I believe the requested extension will enhance the accuracy of the Schedules and Statements when filed and help avoid the potential necessity of substantial subsequent amendments.

46.     Additionally, the Debtors seek authority to file the monthly operating reports (the "MORs") required by the U.S. Trustee Guidelines on a consolidated basis. I believe that consolidated the MORs will further administrative economy and efficiency in these chapter 11 cases without prejudice to any party in interest, and consolidated MORs will accurately reflect the Debtors' business operations and financial affairs because the Debtors regular business practice is to keep consolidated financials. Although the Debtors seek to file one consolidating MOR, their consolidated MOR will still track and break out specific information concerning receipts, disbursements, etc., on a Debtor-by-Debtor basis.

**B.     Pleadings Designed to Preserve Assets of the Debtors' Estates**

47.     In addition to the administrative motions described above, the Debtors are filing, contemporaneously herewith, motions focused more on preserving the Company's assets and facilitating a sale. These motions include motions, including motions seeking (a) authorization to continue using their existing cash management system and dispense with requirements under section 345 of the Bankruptcy Code, (b) to continue the Company's insurance programs, and pay any outstanding premiums or other obligations in respect thereof, (c) a motion seeking the rejection of the Debtors' leases that are not included in the sale to the Purchaser, (d) to reject non-residential real property leases and (e) to use "cash collateral" and to provide adequate protection liens, including first priority liens and/or replacement liens on, and security interests in, the cash collateral.

### i.    Cash Management Motion

48.    The Company has requested the Court allow them to (i) continue to use their existing Cash Management System, (ii) maintain their existing bank accounts and business forms, and (iii) waive the requirements of the Bankruptcy Code to the extent their bank accounts contain funds in excess of the amounts insured by the Federal Deposit Insurance Corporation (the "Cash Management Motion").

49.    The Debtors' Cash Management System consists of twenty-seven (27) bank accounts located at Santander Bank, N.A., a national banking association ("Santander Bank"), and nineteen (19) bank accounts located at TD Bank, N.A. ("TD Bank") (as described more fully below collectively referred to herein as the "Bank Accounts"). Each of the Bank Accounts contains funds and facilitates the flow of funds necessary for the Debtors to satisfy any financial obligations after the Petition Date, including payroll and other administrative obligation. The Debtors will also utilize the Cash Management System to process any remaining accounts receivable that get paid throughout the course of these cases. With this system in place, the Debtors will be able to efficiently process and accurately record collections, transfers, and disbursements as they are made through the various Bank Accounts. However, the disruption and cost associated with opening new accounts outweighs any benefit from doing so.

50.    The Debtors have no investments, securities, or accounts which are not insured by the United States through the Federal Deposit Insurance Corporation (FDIC). With respect to funds held in accounts with Santander Bank and TD Bank, the Debtors' Cash Management System leaves them with limited, if any, funds in excess of the amounts insured by the FDIC. Nevertheless, to the extent such funds exist, the Debtors believe that those funds are secure and that obtaining bonds to secure such funds, as counsel informs is required by the Bankruptcy Code, would be

unnecessary and detrimental to the Debtors' estates and creditors. Among other considerations, (i) the Companies' Banks are highly rated, federally chartered banks subject to supervision by federal banking regulators, (ii) the Debtors retain the right to remove funds held at Santander Bank and TD Bank and to establish new bank accounts as needed. I further believe the cost associated to be in strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in these chapter 11 cases because a bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond were available to the Company at all. I believe that the benefit of waiving the relevant section of the Bankruptcy Code's requirement here far outweighs any potential harm to the estates.

51.      I believe the Cash Management System is necessary to help maximize the value of the Debtors' estates. I believe it would be unduly difficult and expensive for the Debtors to establish a new cash management system. Moreover, the 363 Motion seeks a sale in a short period of time and any delay would jeopardize what the Debtors assert as the best way for them to maximize the value of their assets.

52.      The Debtors therefore request that the Court authorize them to continue using the existing Cash Management System, and to continue to transfer funds into, out of, and through the Company's Cash Management System, as described more fully in the Cash Management Motion being filed contemporaneously herewith.

53.      Additionally, I am advised that the U.S. Trustee Guidelines, among other restrictions and requirements, prohibit disbursements other than by numbered checks, which checks must bear the applicable debtor's case name and case number, a "debtor in possession" designation, and an indication of the account type. I am further advised that rigid adherence to the U.S. Trustee Guidelines would require, among other things, closure of prepetition bank accounts,

the opening of new accounts, and the immediate printing of new checks with a "Debtors in Possession" designation on them. Thus, I believe enforcement of the U.S. Trustee Guidelines in these chapter 11 cases would impose burdensome expenses on the estates, and unnecessarily distract the Debtors from their efforts to complete the sale described in greater in the 363 Motion.

54.     Moreover, in the ordinary course of business, the Debtors may also use other various business forms, including, but not limited to, business letterhead, purchase orders, invoices, envelopes, and other business forms and correspondence (the "Business Forms"). To minimize expenses, the Debtors seek authority to continue using the Business Forms, substantially in the forms existing immediately before the Petition Date and without any reference in such forms to the Debtors' status as debtors in possession. As with the Bank Accounts, I believe requiring the Debtors to change their existing business forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expense. Furthermore, I believe authorizing continued use of both the Bank Accounts and the Business Forms will make the Debtors' transition into chapter 11 smoother, less costly, and more orderly.

   ii.          **Insurance Motion**

55.     Concurrent herewith, the Debtors are filing a motion to continue their prepetition insurance coverage policies and renew them postpetition in the ordinary course (the "Insurance Motion"). In the ordinary course of business, the Debtors maintain approximately eight (8) insurance policies (collectively, the "Insurance Policies," and each individually an "Insurance Policy") that are administered by third-party insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, personal injury liability, property damage, advertising injury, environmental liability, voluntary compensation

liability, cybersecurity issues, workers' compensation liability, travel and automobile-related liability worker's compensation, and officers and directors' liability.

56.    The nature of the Debtors' businesses makes it essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis. The non-payment of any premiums, deductibles, or related fees under the Insurance Policies could result in one or more of the Insurance Carriers (a) terminating the existing policies, (b) declining to renew the Insurance Policies, or (c) refusing to enter into new insurance agreements with the Debtors in the future. If any of the Insurance Policies lapse without renewal, the Debtors could be in violation of state and/or federal law and be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest. Therefore, the Insurance Policies are critical to the preservation of the Debtors' property and business's value which is necessary to support a sale.

57.    Although the Debtors are current with their obligations under their Insurance Policies, additional insurance premiums will become due and owing post-petition. I believe that any interruption in insurance coverage could expose the Debtors to serious risks, such as (a) incurring direct liability for claims, material costs, and other losses that would have been payable by the Insurance Carriers under the Insurance Policies, and (b) higher costs to re-establish lapsed policies or obtain new insurance coverage. I further believe that, in light of the Debtors' anticipated consummation of a sale of Debtors' operations these concerns are even more acute. I believe that the Insurance Policies are essential to maintaining the asset value of the Debtors' business. The Debtors' annual premium payments for the Insurance Policies are approximately one million one hundred thousand ($1,100,000) plus applicable taxes and surcharges.

58.    Certain Insurance Policies require the Debtors to pay a per-incident deductible (collectively, the "Deductibles"). Generally, if a claim is made against the Insurance Policies, the

Debtors' applicable third-party administrator or Insurance Carrier will administer the claim and make payments in connection therewith. The Deductibles, if any, are offset against such administrator's or Insurance Carrier's payment obligation. As of the Petition Date, the Debtors do not believe that they owe any prepetition Deductibles under the Insurance Policies. Out of an abundance of caution, however, the Debtors seek authority to honor any Deductible that may currently exist or otherwise arise under the Insurance Policies in the ordinary course of business.

59.     The Debtors' ability to renew, modify, or supplement existing Insurance Policies, enter into new Insurance Policies, and pay all obligations related thereto is essential to the preservation of the value of the Debtors' businesses and operations. Moreover, it is my understanding that, in many instances, insurance coverage is required by the regulations or laws, the Debtors' credit agreements, and contracts that govern the Debtors' commercial activities, including the requirement by the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, the Debtors seek authorization to maintain and/or modify their existing Insurance Policies, pay prepetition obligations related thereto, and enter into new insurance policies in the ordinary course of business and consistent with prepetition practices.

60.     The Debtors employ Schechner Lifson Corporation (the "Broker") to assist them with the procurement and management of the Insurance Policies. Amounts due to the Broker are paid to it through the premiums the Debtors pay to Insurance Carriers. The employment of the Broker allows the Debtors to obtain and manage the Insurance Policies in a reasonable and prudent manner and to realize considerable savings in the procurement of such policies. Accordingly, the I believe that it is in the best interest of the creditors and Debtors' estates to continue their business relationships with the Broker. After review of their books and records, the Debtors believe that as

of the Petition Date, they do not owe any amounts to the Brokers on account of fees, commissions, or any other prepetition obligations. Nonetheless, in an abundance of caution, in addition to the authorizing the continuation of the Insurance Policies in the ordinary course of business, the Debtors also seek authority to honor any amounts owed to the Brokers to ensure uninterrupted coverage under their Insurance Policies.

61.     It is my understanding that Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. In addition, in many instances, the coverage provided under the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the *Chapter 11 Operating Instructions and Reporting Requirements*, issued by the United States Trustee for Region 2 (the "U.S. Trustee Operating Guidelines").  Given this backdrop, I believe it is essential to the Debtors' estates, and consistent with the Bankruptcy Code and the U.S. Trustee Operating Guidelines, that they maintain and continue to make all payments required under their Insurance Policies.

62.     Insurance Policies and have the authority to supplement, amend, extend, renew, or replace their Insurance Policies as needed, in their business judgment, without further order of the Court. Accordingly, I believe entry of an order granting the relief requested in the Insurance Motion is in the best interests of the Debtors' estates.

iv.     **Wage Motion**

63.     In the ordinary course of business, the Debtors incur payroll and employee benefits obligations to their employees for the performance of services. At its height, the Debtors employed over eight hundred (800) employees and independent contractors. As of the Petition Date, the

23

Debtors employed four (4) full-time employees (the "Employees"), which I believe the Company requires in order to pursue a sale and maximize the value of the estate.

64.     The Company has outstanding obligations with respect to the Employees relating to the period prior to the Petition Date. Certain of these costs and obligations are outstanding, due and payable now, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date.

65.     On or about September 10, 2020, the Debtors will fund payroll for the period of September 7 through September 11, 2020. Because their Employees are paid weekly in arrears, as of the Petition Date, the Debtors have accrued outstanding Wage Obligations aggregating up to $10,304.62 (the "Prepetition Wages"). In an abundance of caution, I believe it is in the best interest of the estates for the Debtors to seek authority to pay the Prepetition Wages, in the event that payroll for some of the employees is not processed by their banks or the Debtors' payroll vendor prior to the filing of the petitions. With respect to the current payroll, no single employee will be paid more than $13,650.00.

66.     Though Debtors do not believe that the Prepetition Wages exceed the statutory cap, in the event that any employee is to be paid Prepetition Wages in an amount in excess of the statutory cap, Debtors will file a notice to the Bankruptcy Court on the electronic docket seeking court approval to make such a payment.

67.     Upon the culmination of each payroll cycle, certain amounts are deducted from each of the Employees' paychecks to account for (i) federal, state and local tax withholdings laws and (ii) pre- and after-tax deductions pursuant to employee benefit plans, which are described below under "Employee Benefits".

68.    The Debtors are required by law to withhold from the Employees' wages amounts related to federal and state taxes, social security and Medicare taxes (collectively, the "Withholding Taxes"), and to remit the Withholding Taxes to the appropriate taxing authorities (collectively, the "Taxing Authorities"). Additionally, the Debtors are obligated to match from their own funds the Social Security and Medicare taxes and to remit to the Taxing Authorities, based on a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").

69.    The Debtors require approval of the Debtors' payment of Payroll Taxes for the prepetition period from September 7, 2020 to September 10, 2020 in the amount of $4,160.02. In an abundance of caution, I believe it is in the best interest of the estate for the Debtors to seek authority to pay the Payroll Taxes in the event that payroll for some of the employees is not processed by their banks or the Debtors' payroll vendor prior to the filing of the petitions.

70.    The Debtors have established various benefit plans and policies for their Employees that can be divided into the following categories: (i) paid time-off, including vacation days and sick/safe leave (collectively, the "PTO Plans"), (ii) medical insurance, dental insurance, vision insurance, and health savings accounts (the "Health and Welfare Plans"), (iii) a 401(k) plan (the "401(k) Plan") and, (iv) a cell phone stipend (collectively with the PTO Plans and Health and Welfare Plans, the 401(k) Plan, the "Employee Benefits"). The Debtors deduct specified amounts from certain Employees' wages in connection with certain of the Employee Benefits. The Debtors propose to keep those policies in place, uninterrupted, during the post-petition pendency of these cases.

71.     Other than the current Chief Executive Officer, who has agreed to cap any payment he may receive at the statutory priority cap, the Debtors do not believe that any single Employee has significant Employee Benefits owed that, combined with the Prepetition Wages, would amount in value to more than $13,650. In an abundance of caution, I believe it is in the best interest of the estates for the Debtors to seek authorization to pay the Employee Benefits in the event that payroll for some of the employees is not processed by their banks or the Debtors' payroll vendor prior to the filing of the petitions. The Debtors' hereby seek authority to pay up to $14,217.82 in respect of Employee Benefits for the prepetition period from September 7, 2020 to September 10, 2020, which represents the total for all employees.

72.     I believe that any delay or failure to pay wages, salaries, benefits and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would likely drive them to resign at a time when the Employees' support is critical to the sale and maximization of the Debtors' estates. Likewise, I submit that it is critical that the Debtors continue to provide the Employee Benefits that were in effect prior to the Petition Date. At this early stage, I believe that the Debtors simply cannot risk the loss the few Employees with the knowledge and expertise necessary to get a sale closed and help wind down these estates. Their help in the tasks to come is critical.

73.     Additionally, absent an order granting the relief requested herein, I believe the Employees will suffer undue hardship and, in many instances, serious financial difficulties. The amounts in question are needed to enable certain of the Employees to meet their own personal financial obligations. I believe that without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives.

**v.      Utilities Motion**

74.      Only the utilities associated with 178 Bruckner Commissary LLC (the "Bruckner Commissary") will remain operational during the pendency of the chapter 11 cases and require continued use of utility services. The Bruckner Commissary houses the Debtors' perishable inventory and specific, high-end equipment. It therefore incurs utility expenses that include electricity, natural gas, waste management, water, internet, and phone. Approximately five (5) utility providers provide services to the Bruckner Commissary.

75.      It is my understanding that, in July 2020, the Debtors spent approximately $10,838.80 on utility costs at the Bruckner Commissary and estimate that, as of the Petition Date, no utility costs are outstanding.

76.      I believe that preserving utility services on an uninterrupted basis is necessary for the Debtors to preserve and maintain their assets, including their perishable inventory and specialized equipment. Indeed, any interruption in utility services—even for a brief period—would seriously threaten the Debtors' inventory and equipment. I further believe that such a result could jeopardize the Debtors' sale efforts, reduce the overall value of the estate and limit creditor recoveries. Therefore, I feel it is critical that utility services at the Bruckner Commissary continue uninterrupted during these chapter 11 cases.

**vi.     Rejection Motion**

77.      The Debtors have twenty (20) leased locations (the "Leased Premises").  The locations have limited value because of the current state of the dining industry.  Landlords and customers alike are uncertain of their future. The Debtors' current monthly rent obligations are approximately $933,000, or approximately $31,000 each day. They have not paid rent since March 2020 when forced to close by Governor Cuomo's' executive order.

27

78.     As described in greater detail in the 363 Motion and consistent with the Sale Agreement, the Purchaser has until five (5) business days before a Sale Hearing to designate which nonresidential real property leases it wishes to have the Debtors assume and assign to them (the "Leases"). To the extent that the Purchaser can reach an agreement with any landlords under a Lease (each a "Landlord," and collectively, the "Landlords"), the Debtors anticipate that any assumption and assignment will be consensual. Nevertheless, in the 363 Motion, the Debtors have requested approval of a mechanism to protect Landlords in the event that the relevant Landlord does not consent to an assignment by providing a notice and cure objection period to resolve disputed cure amounts. The Debtors have requested that the Court set September 30, 2020 as the date for the Court to consider approval of one or more transactions under the 363 Motion (the "Sale Hearing").

79.     After consulting with the Debtors' professionals, I believe that the best way to protect the value of their estates is to seek the Court's prophylactic authorization to reject all Leases not being assumed and assigned at the Sale Hearing. In this way, the Debtors will minimize the amount of administrative rent which I understand could accumulate, along with any incremental additional cost required, if the Debtors were forced to bring a rejection motion only after the Sale Hearing. To the extent the Debtor cannot identify an assignee for any Lease, that Lease would inherently be of inconsequential value to the estate because the Debtors are not maintaining operating location. I believe that the amount of administrative rent the Debtors would be forced to bear for periods past the Sale Hearing is burdensome and would irreparably damage the value of Debtors' estates.

80.     Inasmuch as the Debtors are not operating, they have no use for the furniture, fixtures, equipment and other items of personal property at the locations subject to the Leases (the

"FF&E"). It is clear to me that the cost to store the FF&E past the Sale hearing (either by maintaining a Lease or otherwise), and the cost of removal of the FF&E, is far greater than any value to be garnered by the estate upon a sale of the FF&E to a hypothetical purchaser and is burdensome to Debtors' estates.

81.    Considering the number of Leases to which the Debtors are a party, the limited value of the estate of each Lease and the potential for exorbitant administrative costs, the I believe that rejection and abandonment of such property as of a hearing to approve a sale is the most efficient and economical method to balance the needs of the estate and the rights of other parties in interest.

**vii.    Cash Collateral Motion**

82.    The use of cash collateral proposed under the Stipulation described in the Cash Collateral Motion will provide capital sufficient to continue limited operations and fund the sale and plan confirmation processes while the Debtor operates in chapter 11. I believe that it is beyond question that the Debtor requires the use of cash collateral to avoid the irreparable harm that will be suffered by the Debtor's estate if it does not have access to the cash necessary to do so. Absent use of the Cash Collateral, the Debtors will be forced to convert these cases to cases under chapter 7 of the Bankruptcy Code or dismiss these cases and liquidate out of court. Either alternative means the destruction of the value of all the Debtors' assets.

83.    The Debtor intends to use the funds in its bank accounts to pay the limited staff it is retaining to continue corporate functions, facilitate a sale and assist in the confirmation of a plan. The Cash Collateral will also be used to pay the costs and fees associated with this case and the professional fees required to do so. Without access to the Cash Collateral, the Debtor will not be able to utilize the bankruptcy process to protect its assets while it consummates a sale. In that

instance, I feel the Debtors would need to immediately liquidate their assets in a "fire sale" to the detriment of all of the Debtors' stakeholders if the use of the Cash Collateral were disallowed.

## PART IV: INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

84.     Local Bankruptcy Rule 1007-2 requires that the Debtors provide certain information, which is set forth below.

85.     As required under Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, there have been no committees organized prior to the Petition Date.

86.     As required under Local Bankruptcy Rule 1007-2(a)(4), Exhibit C lists the following information with respect to each of the holders of the Debtors' 20 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. In each case, the claim amounts listed on Exhibit C are estimated and subject to verification. In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

87.     As required under Local Bankruptcy Rule 1007-2(a)(5), Exhibit D provides the following information with respect to holder of the only known secured claims against the Debtors on a consolidated basis: the creditor's name and address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description of the claim, and whether the claim or lien is disputed.

88.     As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtors submit that as of August 31, 2020, the Debtors' unaudited consolidated financial statements aggregated forty-

one million eight hundred and twenty-six thousand six hundred eight dollars ($41,826,608) in total assets and eighty-seven million two hundred forty-eight nine hundred one dollars ($87,248,901) in total liabilities.

89.    As required under Local Bankruptcy Rule 1007-2(a)(7), the Debtors have no publicly held shares.

90.    As required under Local Bankruptcy Rule 1007-2(a)(8), to the best of the Debtors' knowledge and belief, the Debtors do not have any property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

91.    As required under Local Bankruptcy Rule 1007-2(a)(9), Exhibit E provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

92.    As required under Local Bankruptcy Rule 1007-2(a)(10), Exhibit F provides the location of the Debtors' substantial assets, the location of their books and records, and the nature and location of assets held by the Debtors outside the territorial limits of the United States.

93.    As required under Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief, there are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of the Debtors' property may be imminent.

94.    As required under Local Bankruptcy Rule 1007-2(a)(12), Exhibit G provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 10, 2020

*/s/* José Alcalay _____
Name: José Alcalay
Title: Chief Executive Officer