**KLESTADT WINTERS JURELLER**         **Hearing Date: February 16, 2021**
**SOUTHARD & STEVENS, LLP**        **Hearing Time: 10:00 a.m.**
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Kathleen M. Aiello

*Counsel to 175 East 74th Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re                                                    :

:            Chapter 11

COSMOLEDO, LLC *et al.*[1]                 :

:            Case No. 20-12117 (MEW)

:

                        Debtors.        :            (Jointly Administered)
-----------------------------------------------------------x

**175 EAST 74TH CORPORATION'S OBJECTION TO MK USA, LLC'S MOTION TO ENFORCE THE ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF AGAINST 175 EAST 74TH CORPORATION**

**TO THE HONORABLE MICHAEL E. WILES,**
**UNITED STATES BANKRUPTCY JUDGE:**

        175 East 74th Corporation (the "Landlord"), by its undersigned counsel, submits this objection (the "Objection") to *MK USA, LLC's Motion to Enforce the Order (A) Approving the Sale of Substantially All of the Debtors' Assets, Free and Clear of All Liens, Claims and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Cosmoledo, LLC (6787); Breadroll, LLC (3279); 688 Bronx Commissary, LLC (6515); 95 Broad Commissary, LLC (2335); 178 Bruckner Commissary, LLC (2581); 8 West Bakery, LLC (6421); NYC 1294 Third Ave Bakery, LLC (2001); 921 Broadway Bakery, LLC (2352); 1800 Broadway Bakery, LLC (8939); 1535 Third Avenue Bakery, LLC (1011); 2161 Broadway Bakery, LLC (2767); 210 Joralemon Bakery, LLC (4779); 1377 Sixth Avenue Bakery, LLC (9717); 400 Fifth Avenue Bakery, LLC (6378); 1400 Broadway Bakery, LLC (8529); 575 Lexington Avenue Bakery, LLC (9884); 685 Third Avenue Bakery, LLC (9613); 370 Lexington Avenue Bakery, LLC (0672); 787 Seventh Avenue Bakery, LLC (6846); 339 Seventh Avenue Bakery, LLC (1406); and 55 Hudson Yards Bakery, LLC (7583).

1

*Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (c) Granting Related Relief against 175 East 74th Corporation,* as corrected on January 22, 2021 [ECF No. 231] (the "Motion"), and respectfully sets forth as follows:

**PRELIMINARY STATEMENT**

This matter centers around the correct interpretation of two orders arising from this Chapter 11 case: (i) the *Order (I) Authorizing (a) Rejection of Certain Unexpired Leases of Nonresidential Real Property and (B) Abandonment of Certain Personal Property in Connection Therewith Each Effective as of a Sale Hearing and ((II) Granting Related Relief* (the "Abandonment Order") [ECF No. 165], and (ii) the *Order (A) Approving the Sale of Substantially All of the Debtors' Assets, Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (the "Sale Order") [ECF No. 166].

From the onset of the Debtors' bankruptcy cases, the discussions between MK USA, LLC ("Aurify"), by and through its retained real estate advisor, RCS Real Estate Advisors ("RCS") and the Landlord focused on Aurify's unilateral objective of entering into a new lease for the Landlord's Premises after the Debtors rejected the lease and abandoned any furniture, fixtures and equipment ("FF&E") on the Premises. Aurify, a portfolio company of a private investment firm[2], retained RCS to engage in discussions with this Landlord, as well as numerous other landlords impacted by the Debtors' bankruptcy filing, in the negotiations for a new lease.

---

[2] *See* Declaration of Robert Garrett, Chief Financial Officer of Aurify Brands, LLC Regarding Corporate Structure of Proposed Stalking Horse Bidder and Lack of Any Affiliation with Debtors [ECF No. 28], at ¶ 5.

2

Rather than assume the Debtors' leases through assignment in connection with Aurify's purchase of the Debtors' Assets, a common bankruptcy strategy, Aurify instead elected to have the Debtors reject its leases, with the exception of one lease, and to engage directly with each of the landlords to enter into new leases. Presumably, Aurify felt confident it could take advantage of the current real estate market, including landlords like this Landlord, a small residential cooperative apartment corporation, to optimize its terms in a new lease rather than to assume the Debtors' leases through its then-pending asset purchase. Through this structure, Aurify avoided any requirements to satisfy the landlords' cure costs through assumption and assignment of the Debtors' leases, but assumed the risk that any one of the Debtors' landlords did not want a new lease with Aurify. This was a design of Aurify's own making.

To gain leverage in its negotiations with the landlords, Aurify included the furniture, fixtures and equipment at each of the Debtors' locations in its purchase of the Debtors' assets, even though Aurify was not guaranteed access or rights to any of the landlords' premises without a new lease. Aurify's strategy seems to rest on the assumption that it could leverage a landlord's desire not to be burdened with equipment left behind by the Debtors post-lease rejection, with little to no value in a market flooded with restaurant equipment, as an entry point to engage the landlords in negotiations for a new lease. Aurify seemingly dangled the purchase of the Debtors' FF&E as a carrot to lead the landlords into broader discussions regarding the future of the landlords' rejected leases.

The potential relief Aurify's strategy offered landlords was negligible when compared with the landlords' mounting claims for months of unpaid rent and anticipated lease rejection damages. Moreover, Aurify's proposed structure left the landlords without remedy against the Debtors if and when Aurify created damage on the landlords' property upon removal given the size and nature

3

of the equipment at issue. Given the terms of the Lease here, the Landlord would have likely preferred it if Aurify assumed the Lease and cured the Debtors' obligations. But, by its own design, Aurify assumed the risk that any one of the Debtors' landlords, including this Landlord, would not want to enter into a new lease with Aurify.

The FF&E remaining on the Premises (defined below) post-lease rejection was always the tail wagging the dog with respect to the discussions between the Landlord and Aurify. From the beginning, RCS never engaged the Landlord in discussions regarding the FF&E. In fact, RCS only passively engaged this Landlord in negotiations for a new lease – frequently disappearing each time the Landlord proposed actual lease terms. During the time before the Abandonment Date, it was clear that Aurify did not have any real knowledge of the FF&E that was actually present on the Landlord's Premises. Aurify had never visited the Landlord's Premises, inspected the FF&E nor had it conducted a valuation, giving more credence to the fact that Aurify included the FF&E in the overall Asset Sale solely in an effort to gain leverage over the landlords to negotiate a new lease. Since the market is already flooded with this type of equipment, it is unlikely Aurify placed real value in the FF&E, particularly when it did not really know what remained on the Landlord's Premises. At most, the FF&E on site at the Landlord's Premises, not all of which is desired by Aurify, has a value of less than $74,000[3] in the current market.

It is evident from the communications both in Court and between the parties that a new lease was Aurify's primary goal. Aurify's strategy may well have been a good one if it could achieve a new lease with the Landlord. Only when it became clear to Aurify that it was not going

---

[3] The Landlord obtained a current appraisal of the FF&E remaining on the Premises, which was estimated as $73,575.00. Notably, Aurify has requested the removal of fewer items of FF&E than was assessed in the appraisal value, thereby reducing the value of what Aurify is seeking to remove. This appraisal value does not consider the condition of the FF&E and the cost of safely and securely removing the FF&E from the Landlord's Premises, all of which would reduce the overall value.

4

to achieve its goal of a new lease for the Landlord's Premises did its aggressive pursuit of the FF&E *at all costs* take center stage. From that point on, Aurify ignored, and in fact denied, the clear and unambiguous terms of the Abandonment Order, which abandoned the FF&E on the Premises "to the Landlords" on November 2, 2020 (the "Abandonment Date") and expressly granted the Landlords the authority "to dispose of FF&E in their sole and absolute discretion without liability to the Debtors or any third party upon such abandonment" [emphasis added]. This is a surprising position considering Aurify's integral role in negotiating, if not in drafting, the Abandonment Order.

To further complicate Aurify's position, its strategy broke down further when it permitted two different orders to be entered – the Abandonment Order, *and later*, the Sale Order. While Aurify now wants to enforce the Sale Order to suit its narrative, it is the Abandonment Order which makes it clear the FF&E was abandoned to the Landlord on November 2, 2020 at 11:59 p.m. Any attempt by Aurify to assert that the Abandonment Date was consensually extended by the parties lacks credibility because it is clear the parties never had a meeting of the minds with respect to those terms and the Landlord made it clear to Aurify that its actions were and will be guided by the clear terms of the Abandonment Order.

By its Motion and position taken therein, Aurify grasps at straws trying to string together a number of different sources, even resorting to violating the Federal Rules of Evidence to include confidential settlement communications so marked by Rule 408, to develop its position and to cure its oversight with respect to the Abandonment Order. Aurify goes to such lengths because the facts and plain language of the Abandonment Order does not favor the untenable position espoused by Aurify in its Motion.

5

**BACKGROUND**

1. On September 10, 2020 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2. Prior to the Petition Date, one of the Debtors, NYC 1294 Third Ave Bakery, LLC d/b/a Eric Kayser Boulangerie (the "Tenant") was party to that certain lease (the "Lease"), dated February 19, 2019, for non-residential real property for the premises located at 1294 Third Avenue, New York, New York 10021 (the "Premises").

3. On October 29, 2020, the Bankruptcy Court held a hearing (the "Sale Hearing") to consider final approval of a sale pursuant to the *Motion of the Debtors for Orders (I) Scheduling Hearing to Consider (A) Sale of Substantially All of the Debtors' Assets, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher And Better Offers And (B) Assumption and Assignment of Leases and Executory Contracts; (II) Scheduling Hearing to Consider Approval of Stalking Horse Agreement, Related Bid Protection and Bidding Procedures for the Conduct of an Auction; (III) Fixing a Cure Claims Bar Date with Respect to the Assumption of Leases and Executory Contracts; (IV) Fixing Manner and Notice of Sale Hearing; (V) Authorizing the Debtors to Sell Assets, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers; (VI) Authorizing Assumption and Assignment of Leases and Executory Contracts; and (VII) Granting Related Relief* (the "Sale Motion") [ECF No. 18], and authorizing the Debtors to abandon any remaining FF&E located at the Leased Premises.

4. After the Sale Hearing and before the Abandonment Order was entered, the Landlord and Aurify, by and through RCS, engaged in discussions regarding the terms of the abandonment or removal of the furniture, fixtures and equipment (the "FF&E") located on the

Landlord's Premises and the potential extension of such terms to discuss the possibility of a new lease.

5. However, Aurify (through RCS) never responded, let alone did it confirm the terms of the extension outlined in the e-mail dated October 30, 3020. *See* Hall Declaration at Ex. 2. The terms of the agreement were never accepted.

6. On November 2, 2020 at 12:25 p.m. EST, the Bankruptcy Court entered the Abandonment Order.

7. In relevant part, the Abandonment Order provides, "[T]he FF&E is, and hereby shall be deemed to be, abandoned to the Landlords, as of the earlier of (as) the date of rejection under decretal paragraph 2 hereof or (b) 11:59 p.m. on November 2, 2020. **The Landlords are authorized to dispose of FF&E in their sole and absolute discretion without liability to the Debtors or any third party upon such abandonment**" [emphasis added].

8. Following the entry of the Abandonment Order, on November 2, 2020 at 5:11 p.m. EST, the Bankruptcy Court entered the Sale Order.

9. November 4, 2020, the Debtors filed the *Notice of Closing of Sale of Substantially All of the Debtors' Assets* [ECF No. 168], indicating that the sale had closed on November 2, 2020

10. Upon information and belief, and according to Aurify's representation in the Corrected Motion, filed on January 22, 2021 [ECF No. 231], Aurify's purchase of the Debtors' assets closed on November 2, 2020.

11. Upon entry of the Abandonment Order, which was specifically negotiated by Aurify, it became abundantly clear that the FF&E was abandoned *to the Landlords* as of November 2, 2020 at 11:59 p.m. and that the Landlords were expressly authorized to dispose of the FF&E in their sole and absolute discretion, the Landlord made clear to Aurify (through RCS) in an email

7

the following morning (November 3, 2020 at 9:55 a.m.) that it would abide by the clear and unambiguous terms of the Abandonment Order entered by the Bankruptcy Court, "Given that we haven't heard from you regarding the below [proposed counteroffer to extend the discussions between the parties], and the bankruptcy order that was entered yesterday provides otherwise, the terms of the bankruptcy order will govern the disposition of the FF&E and the other terms contained below." *See Declaration of Deborah Ginsberg in Support of 175 East 74th Street Corporation's Objection* (the "Objection") *to MK USA, LLC's Motion to Enforce the Order (A) Approving the Sale of Substantially All of the Debtors' Assets, Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (C) Granting Related Relief against 175 East 74th Corporation* (the "Ginsberg Declaration) at Ex. 1, p. 2; *see also* Abandonment Order at ¶ 7.

12.     Thereafter, the Landlord agreed not to dispose of the FF&E while Aurify continued to threaten legal action and the Landlord, in good faith, continued to engage with Aurify to reach a consensual resolution of this matter. Irrespective of the resolution regarding the FF&E, even after the Landlord communicated to Aurify that it would not be engaging in discussions regarding a new lease, Aurify continued to place the prospect of a new lease at the forefront of its discussions with the Landlord.

13.     Now, by virtue of its Motion, Aurify asks the Court to enforce the terms of the Sale Order without regard for the clear and unambiguous terms of the Abandonment Order upon which the Landlord reasonably relied, which granted rights to the disposition of the FF&E on the Premises wholly within the Landlord's possession and control.

## OBJECTION

8

### A. The Abandonment Order is Unambiguous and Governs the Disposition of the FF&E on the Premises

14. Aurify inappropriately relies solely on the Sale Order for its position regarding the disposition of the FF&E. By its clear terms, the Abandonment Order specifically abandoned the FF&E remaining on the Premises to the Landlord as of 11:59 p.m. on November 2, 2020 (at the latest).

15. In support of its proposition that the Court should enforce the Sale Order, Aurify cites Section 105(a), among other provisions of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *See* Motion at ¶ 26. Aurify further supports its Motion with the proposition that "[…] it is well-established that bankruptcy courts have broad authority to interpret and enforce compliance with their own orders. *See In re McLean Indus.*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("All courts [ ] have inherent contempt power to enforce compliance with their lawful orders. The duty of any court to hear and resolve legal disputes carries with it the power to enforce the order."); *see* Motion at ¶ 26.

16. While the Landlord does not dispute the Court's inherent authority to interpret its own orders, Aurify has failed to prove a cognizable basis for the Court to ignore the Abandonment Order in favor of the Sale Order[4], which, importantly, makes no specific reference to the FF&E

---

[4] Despite incorporating the Asset Purchase Agreement ("APA") by reference in a footnote, the Sale Order references a sale of "substantially all of the Debtors' assets (including, without limitation, (y) the equity ownership interests in 688 Bronx Commissary, LLC, a New York limited-liability company ("688 Bronx") collectively, all such assets, the "Assets"). *See* Sale Motion [ECF No. 18] at ¶ 15, FN 5. To further confound matters, the APA is *anything but clear* in delineating whether certain FF&E is included as a Purchased Asset under Section 2.1 or whether, *since this Landlord qualifies as an "Excluded Restaurant"* under the APA, whether the FF&E on its Premises was contemplated in the Purchased Assets. *See* APA [ECF No. 26] at Sections 2.1, 2.11. Section 2.11 appears to contemplate Aurify's purchase of the FF&E at the "Continuing Restaurants", which the Landlord's location is not. *See* APA at Section, 2.1; *see also* APA at Section 3.5 (stating "[t]he Purchased Assets constitute substantially all of the properties, assets, furniture, fixtures, equipment and rights used by the Sellers to conduct and operate the Business at the Continuing

9

anywhere in its twenty-two pages. Nor can Aurify now justify why it wishes the Abandonment Order gave the Landlord the rights Aurify now wishes it had. In fact, Aurify completely ignores that the Abandonment Order was entered before the Sale Order and put into effect the Abandonment Date within hours of entry of the Abandonment Order, upon which the Landlord reasonably relied. On the contrary, the Sale Order, which was entered by the Court *later* that same day, granted the Debtors and Aurify the *authority* to close on Aurify's purchase of the Debtors' assets. It was not until November 4, 2020, when the *Notice of Closing of Sale of Substantially All of the Debtors' Assets* [ECF No. 168], indicating that the sale had closed on November 2, 2020, was filed publicly on the docket were creditors who were not a party to the sale agreement, like the Landlord, were notified that the closing had occurred.

17.   Moreover, as set forth in the colloquy in the transcript of the October 29, 2020 hearing and as demonstrated in the Abandonment Order, Aurify was specifically involved in revising the Abandonment Order after the hearing to incorporate Paragraph 3. Paragraph 3 of the Abandonment Order addresses Aurify's compensation of the landlords for any use and occupancy charges incurred after the Abandonment Date. Aurify suggests that Paragraph 3 of the Abandonment Order, "envisions scenarios in which the FF&E remains on the leased premises, remains Purchaser's property and is not abandoned as of 12:00 a.m. on November 3." *See* Motion at ¶ 30. However, Aurify's insertions into the Abandonment Order failed to clarify any language regarding the terms of the FF&E abandonment set forth in Paragraph 7, nor did it insert any reference *at all* to the FF&E in Paragraph 3 of the Abandonment Order.

---

Restaurants in all material respects as conducted and operated by the Sellers prior to the Business Cessation Event."). Aurify cannot now have it both ways.

18. In fact, using the logic Aurify now espouses in its Motion, it is unclear why the FF&E needed to be abandoned at all if Aurify's purchase of the FF&E was squarely and exclusively addressed in the Sale Order. The Abandonment Order states that the Debtors abandoned the FF&E because it "was burdensome and of inconsequential value to the estate," (*See* Abandonment Order at ¶ F), which is counterintuitive to Aurify's premise that it paid value to the Debtors for the FF&E specifically remaining on the Landlord's Premises. In fact, if the Sale Order is the only order that applies to the FF&E remaining on the Landlord's Premises, as Aurify would lead the Court to believe, then reference to the FF&E could have been removed from the Abandonment Order entirely. Instead, a lease rejection order could have referenced the Sale Order to govern the disposition of the FF&E. Indeed, that did not occur here.

19. Aurify clearly had the opportunity to clarify these issues in the Abandonment Order and to further its strategy, designed for its benefit, but it failed to do so and the Court entered the Abandonment Order – an order upon which this Landlord reasonably relied.

20. Aurify should not now be permitted to ignore the clear and unambiguous terms of the Abandonment Order - an order it had a heavy hand in drafting - to the detriment of this small residential coop that is trying to minimize its losses. Aurify's revisions to the Abandonment Order after the Sale Hearing simply do not accomplish for Aurify's strategy what in hindsight it wished it had. As previously stated, Aurify's claim to the FF&E will not gain it an opening to discussions of a new lease with this Landlord. Instead, it leaves the parties squabbling over less than $75,000 worth of equipment and the costs to restore the Premises.

21. Thus, this Court should enforce the terms of the Abandonment Order with respect to the FF&E remaining on the Landlord's Premises.

### B. The Landlord Relied on the Abandonment Order Which was Not Extended by Agreement between the Landlord

22. In its Motion, Aurify also leads to the Court to believe that the clear and unambiguous terms of the Abandonment Order did not take effect on the Abandonment Date with respect to this Landlord because the Abandonment Date was extended upon consent of the parties. Indeed, mutual consent of these terms was never achieved.

23. To support its position Aurify relies upon emails between RCS and the Landlord – communications which were clearly in the nature of settlement communications. *See* Motion at ¶ 31, Ex. 2.

24. On October 30, 2020, the Landlord and RCS corresponded regarding the FF&E remaining on the Landlord's Premises. Aurify incorrectly relies on these communications as an "agreement" between the Landlord and Aurify when it is clear there was never a meeting of the minds between the parties and, in fact, the Landlord's offer to do anything other than to abide by the express terms of the Abandonment Order was revoked. In fact, RCS never responded to the Landlord's proposal at all before the Abandonment Date became effective, when it became clear that any discussions between the parties before entry of the Abandonment Order were rendered moot when Aurify permitted Paragraph 7 of the Abandonment Order to become effective.

25. What is more, even after Aurify repeatedly represented to the Bankruptcy Court at the October 29th hearing that it would pay per diem rent for each day post-rejection, and such terms were specifically incorporated in the Abandonment Order (*see* Abandonment Order at ¶ 3), RCS immediately backtracked on that offer, asking the Landlord to waive its right to per diem rent while they continued to negotiate a new lease. Continuing to negotiate in good faith with RCS, as it had done since the beginning of this case, the Landlord responded with a counteroffer regarding the terms for the post-rejection, post-abandonment period. The Landlord never received a response to

its counteroffer. *See* Hall Declaration at Ex. 2 at p. 2. Thus, a meeting of the minds was never achieved.

26. RCS's lack of response to the Landlord's proposal on October 30th was reflective of the communications the Landlord experienced with RCS up to that point. With each contact, RCS put extreme pressure on the Landlord to attempt to reach a deal regarding a new lease. The Landlord would promptly respond with concrete deal terms and RCS would disappear, never responding to the offer. After two months of the same hurry up and wait pattern, it became difficult for the Landlord to take RCS or Aurify seriously in its negotiations. This behavior influenced the Landlord's decision not to enter into a new lease with Aurify. The Landlord made it clear to Aurify in its October 30th communication that no agreement was reached, revoked any prior offers that were never accepted, and that the Landlord's actions going forward would be governed by the Abandonment Order.

27. Aurify should not be permitted to rely on these communications as an *agreement* to nullify the enforceability of the Abandonment Order, and paragraph 7 in particular.

### C. The Disputed FF&E are Fixtures and Cannot be Removed Without Damaging the Premises

28. Since Aurify began disputing the terms of the Abandonment Order, and the Landlord's clear authority to dispose of FF&E in their sole and absolute discretion granted therein, it has given short shrift to the undertaking involved to remove any FF&E from the Landlord's Premises. In fact, on several occasions, it has provided the Landlord with less than twelve hours' notice before saying it will show up on site to remove the FF&E.

29. In taking that approach, Aurify disregards the nature of some of the FF&E on site. It seems unlikely that Aurify will be able to safely and responsibly remove some or all of the FF&E to which it lays claim without causing damage to the Landlord's Premises. Aurify also fails to

13

account for the fact that some of the FF&E has become a fixture on the Premises to which the Landlord now clearly owns under New York State law and the terms of the Debtors' Lease.

30. Moreoever, if Aurify were granted permission to remove the FF&E from the Landlord's premises and it caused damage to the Premises in the process, the Landlord is now without remedy to enforce its damages claim against the Debtors or their estates because of the structure specifically designed by Aurify in this case.

31. The Landlord has already been damaged by virtue of the Debtors' rejection of its Lease. Adding insult to injury, the Landlord is now subjected to dealings with Aurify, an aggressive party with whom it did not voluntarily engage in business and who has caused the Landlord further time, delay, legal fees and other expenses, along with the potential damage to its Premises by its ignorance of the Abandonment Order and its consistent threats of litigation. The Landlord is simply trying to minimize its exposure to greater damages that may be caused by Aurify's removal process and continued litigation by relying on the rights expressly granted it in the Abandonment Order.

32. Thus, the Landlord respectfully requests that the Court uphold the Abandonment Order and permit the Landlord to engage in its own process to dispose of the FF&E on its Premises in its "sole and absolute discretion without liability to the Debtors or a third party", as expressly granted in the Abandonment Order. *See* Abandonment Order at ¶ 7.

## **RESERVATION OF RIGHTS**

33. The Landlord expressly reserves its rights to seek further relief or to amend or supplement this Objection as anew information becomes known to it. Nothing in this Objection shall be deemed an admission or waiver with respect to the Landlord's right to dispute any other claims asserted by or against the Landlord.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the Landlord respectfully requests that the Court: (i) deny Aurify's Motion; (ii) enforce the Abandonment Order to permit the Landlord to retain the FF&E and dispose of it in its "sole and absolute discretion without liability to the Debtors or any third party"; and (iii) grant such other and further relief as is just and proper.

Dated: New York, New York
February 9, 2021

                                        **KLESTADT WINTERS JURELLER**
                                        **SOUTHARD & STEVENS, LLP**

By: */s/ Tracy L. Klestadt*
     Tracy L. Klestadt
     Kathleen M. Aiello
     200 West 41st Street, 17th Floor
     New York, New York 10036
     Tel: (212) 972-3000
     Fax: (212) 972-2245
     Email: tklestadt@klestadt.com
             kaiello@klestadt.com

*Counsel to 175 East 74th Corporation*